# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | **Case No. 05-21306-TLM** |
| **VICKI J. FEHRS,** | ) | |
| **fka VICKI HEARD,** | ) | |
| | ) | |
| Debtor. | ) | **Chapter 7** |
| _____ | ) | |
| | ) | |
| **ABEL O. MURRIETTA,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adv. No. 06-07020-TLM** |
| | ) | |
| **VICKI J. FEHRS,** | ) | |
| **fka VICKI HEARD,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| **FORD ELSAESSER, TRUSTEE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adv. No. 07-07032-TLM** |
| | ) | |
| **VICKI J. FEHRS,** | ) | |
| **fka VICKI HEARD,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| | ) | |

MEMORANDUM OF DECISION - 1

FORD ELSAESSER, TRUSTEE,   )
                           )
            Plaintiff,     )
                           )
v.                         )         Adv. No. 07-07033-TLM
                           )
VICKI J. FEHRS,            )
fka VICKI HEARD,           )
                           )
            Defendant.     )
_____  )

## MEMORANDUM OF DECISION
_____

### INTRODUCTION

Before the Court are three adversary proceedings related to the same

chapter 7 bankruptcy case, Case No. 05-21306-TLM, filed by Vicki J. Fehrs, fka

Vicki Heard ("Debtor") on August 29, 2005.

In Adv. No. 06-07020-TLM, creditor Abel O. Murrietta ("Murrietta"), and

in Adv. No. 07-07033-TLM, Debtor's chapter 7 trustee, Ford Elsaesser

("Trustee"), seek to revoke the discharge previously granted Debtor.  *See*

§§ 727(d)(1) and (2).[1]  Trustee also sued Debtor in Adv. No. 07-07032-TLM to

avoid an alleged fraudulent transfer under §§ 548(a)(1)(A) and (B).

_____

[1]  Unless otherwise indicated, all statutory references are to the Bankruptcy Code, Title
11, U.S. Code. §§ 101-1300 (2005).  The amendments to the Bankruptcy Code by the Bankruptcy
Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119
Stat. 23 (2005), do not apply as Debtor's petition preceded BAPCPA's effective date.

MEMORANDUM OF DECISION - 2

The parties agreed to, and the Court ordered, a consolidated trial.  *See* Fed.

R. Civ. P. 42(a)(1), incorporated by Fed. R. Bankr. P. 7042.  Trial took place on

June 11, 2008, and all issues were taken under advisement.

Having carefully considered the evidence presented, the parties' legal

arguments, and applicable authorities, the following constitutes this Court's

findings of fact and conclusions of law.  Fed. R. Bankr. P. 7052.

**BACKGROUND AND FACTS**

The adversary proceedings present multiple issues, though the same revolve

around a common set of facts.  The evidence establishes the following.[2]

### A.    Debtor

Debtor is a 53 year old woman.  She served several years in the Army,

being discharged after suffering an injury in a fall and being unable to sufficiently

rehabilitate.[3]  She has been effectively unemployed since that discharge.  She

receives Social Security and Veterans Administration (VA) benefits.

She testified that as a result of her injury she suffers from migraines,

---

[2]  The Court's findings that are based on testimony include the Court's evaluation of the credibility of the witness and the weight to be given the testimony, even if those considerations are not highlighted in the text of the Decision.

[3]  The parties stipulated to the admission of, *inter alia*, Debtor's February 12, 2008 deposition.  *See* Ex. 301 ("Deposition").  Debtor there indicated she joined the military upon leaving high school in 1973, served seventeen years before the injury, and an additional three years while determining if rehabilitation was possible, with discharge occurring in 1993.  *Id.* at 11-13.

muscle pain, lack of sleep, difficulty walking, and "concentration difficulties" among other symptoms, and treats them (especially pain) with medication. She, however, appeared intelligent[4] and testified clearly and without obvious impairment of her recall or understanding, though she did exhibit physical symptoms from her injury, such as difficulty in walking.

Debtor previously filed a chapter 7 bankruptcy in the Eastern District of Washington in 1989. This case was a chapter 7, and she received a bankruptcy discharge. She testified that she was familiar with the bankruptcy process, including the requirement of full and complete disclosure of assets and transfers.

Debtor married Mark Heard in November, 1997. She and Heard have never divorced, and have been continuously married since 1997. However, they have been separated physically for extended periods of time. On the date of the bankruptcy petition, Debtor lived in North Idaho. She now lives in Spokane Valley, Washington. Heard lives in Bellflower, California, and works in Southern California.

### B.    Murrietta and Debtor, and Debtor's dependents

In the spring of 2002, Murrietta met Debtor in Mullan, Idaho. They started living together that summer. Also living with them was Debtor's teenage son.

---

[4] Debtor graduated high school, had a couple of years of college, and worked as a file manager and office administrator in the military.

MEMORANDUM OF DECISION - 4

His given name was Jae Barton Avery.[5]  He also went by the name of Jae Barton

Van Skiver, using his grandmother's last name, something he started doing in high

school.  Both Jae and Bart appear to have been used interchangeably as first

names.

Also living with Debtor and Murrietta was a much younger "adopted" son,

Jovani Fehrs, who had been born to a friend of Debtor.  Debtor received "adoption

assistance" support and Social Security payments for Jovani.[6]

### C.    Debtor purchases the "Terrill Loop Property"

In October 2003, Debtor purchased real property located at 117 Terrill

Loop in Mullan, Idaho, legally described as the North one-half of Lot 3 and all of

Lots 4 and 5, Block 11, Mullan, Official Records of Shoshone County, Idaho (the

"Terrill Loop Property").  Ex. 102 (warranty deed, recorded November 4, 2003).

Debtor purchased the property from Art Britton.  *Id.*

Debtor took title to the Terrill Loop Property as "Vicki Fehrs, an unmarried

person."  *Id.*  Debtor paid the $14,000.00 purchase price for this property using

funds she obtained from Murrietta.[7]

---

[5]  Debtor was married to her son's father, named Avery, in 1985-86.

[6]  Debtor also cared for various grandnieces and nephews who had previously been in
foster care, and she testified that she received some financial assistance from North Dakota for
doing so.

[7]  Murrietta indicated that, according to Debtor, taking title solely in her name was due to
(continued...)

MEMORANDUM OF DECISION - 5

### D.   The "Second Street Property"

In 2003, Murrietta and Debtor entered into an agreement with a residential contractor, Peter Axtman, to tear down a house and build a new house in its place for them on property located at 464 Second Street in Mullan, Idaho (the "Second Street Property").[8]  Debtor told Axtman that the property was "hers" and that Murrietta was providing the funding for construction.[9]  Murrietta, but not Debtor, signed the contract with Axtman in July, 2003.  Ex. 303 at attach.[10]

Axtman indicated that the work commenced in August, 2003 but by October of that year, several disputes had arisen.  He indicated that many of the disputes were based on changes that Debtor wanted to make; she testified that the problems were instead based on Axtman's poor construction.  Axtman quit the project in late October.  An extended period of negotiation commenced over who owed what to whom, ending with a lawsuit filed by Axtman against Murrietta and

---

[7](...continued)
the fact that taking title jointly would create problems for Murrietta and Fehrs in their efforts to adopt Jovani.

[8]   In her Deposition, Debtor indicated that she bought this property at 464 Second Street in Mullan in the early 1990's.  Ex. 301 at 14.  However, it appears that she was deeded the property (as "Vicki Fehrs, a single woman") in 2003.  *Id.* at 57-60 and internal Ex. 6.

[9]   Murrietta testified that he had given Debtor $40,000.00 to help pay her debts, and $32,000.00 toward the construction on the Second Street Property.  At least some of these funds, he says, were to be repaid by Debtor when she got a "settlement" from the Government.

[10]   Though only Murrietta signed, the party contracting with Axtman is shown as "Abel and Vickie Murrietta."

Debtor in February, 2005.  Ex. 303.[11]

Debtor and Murrietta separated either in December, 2004, some two

months before the suit was filed (per Murrietta) or in March of 2005, a month after

its filing (per Debtor).[12]

### E.    Debtor transfers Terrill Loop Property to her son, Jae

On April 20, 2005, Debtor, under the name "Vicki Fehrs," executed and

recorded a quitclaim deed transferring her interest in the Terrill Loop Property to

Jae Avery for consideration of one dollar ($1.00).  Ex. 103 ("Quitclaim Deed").

The Quitclaim Deed lists a mailing address for Jae in Bellflower,

California, which was the apartment address of Debtor's husband, Heard.

However, Jae at the time lived with Debtor.  In fact, Debtor testified that the

reason behind and motivation for the transfer was that Jae not only lived in the

Terrill Loop Property but would be the only one staying there for a period of time

that spring or early summer when Debtor planned to visit California.  She testified

that she was concerned Jae would get into trouble with friends from school,

including drinking or partying, and the transfer was – in her mind – a way to

---

[11]  During this period between contract and suit, Debtor (as "Vicki Fehrs, a single woman") executed an August, 2004, warranty deed to the Second Street Property to her brother and sister-in-law, John and Lisa Fehrs.  Ex. 301 at internal Ex.7.  Debtor testified she sold it for $10,000.00.  It was sold with the partially completed Axtman structure on it.  Ex. 301 at 61-64.

[12]  This sort of testimonial disagreement permeated the accounts of events by Murrietta and Debtor, and there was often insufficient corroborating or impeaching evidence to resolve the difference.

MEMORANDUM OF DECISION - 7

insure that she would not be liable if something occurred at the property while she was away, as well as a way to encourage Jae to be more responsible.[13]

Debtor initially testified that her visit to California lasted a month or so, though she returned for Jae's high school graduation in June, 2005.[14]  Through cross-examination and impeachment with bank records showing North Idaho financial activity, the duration of her California trip shortened to a couple of weeks and, as she finally admitted, "maybe a week."

Debtor testified that she had no intent to permanently transfer the property, and that it remained her property, not Jae's.  *See*, *e.g.*, Ex. 301 at 80-81.  But during cross-examination, Debtor admitted that she understood the effect of quitclaim and other deeds, and had purchased and sold real properties.  She understood that the Quitclaim Deed transferred her ownership interest to her son.[15]

---

[13]  In an earlier affidavit, and initially at trial, Debtor stated the idea behind this transfer was Murrietta's.  However, it became apparent that Debtor developed the idea herself, though her thinking may have been partially reliant on her interpretation of a property transfer that Murrietta had made or discussed at some much earlier time.  The implication that Murrietta suggested or knew of the transfer of the Terrill Loop Property to Jae, as urged by Debtor at various stages of the case, was not proven.

[14]  She also testified that immediately after graduation, Jae entered the U.S. Marine Corps and left North Idaho.

[15]  Though the "logic" behind the transfer was never persuasively explained, it clearly related to Jae being the sole resident at the Terrill Loop Property – a circumstance that lasted only about a week.  Given the short duration of Jae's sole occupancy, the rationale Debtor espoused would support a June, 2005, quitclaim deed from Jae to her, reversing the April 20 transfer because under Debtor's logic, the transfer to Jae was no longer needed.  However, as discussed below, Debtor had Jae sign a power of attorney rather than a quitclaim deed.

MEMORANDUM OF DECISION - 8

### F.   Debtor's chapter 7 bankruptcy filing

Approximately four months later, on August 29, 2005, Debtor filed her chapter 7 bankruptcy petition, schedules and statement of financial affairs ("SOFA"), with the assistance of attorney Harold B. Smith.  Case No. 05-21306-TLM, at Doc. No. 1.[16]

The petition was filed under the name "Vicki Jean Fehrs, fka Vicki Heard." Doc. No. 1 at 1.  Though indicating that she was "formerly known as" Vicki Heard, Debtor was still married to Heard at the time of filing.  She did not disclose that she was married, nor disclose Heard's income, nor address any community property in the filing.[17]

The petition lists Debtor's residence or street address as 202 Pine Street, Mullan, Idaho 83846 ("Pine Street Property").  It also lists a mailing address of P.O. Box 90, in Mullan, Idaho.  Debtor scheduled her ownership interest in the Pine Street Property.  Doc. No. 1 at sched. A.  No other real property is listed.

---

[16]   Selected portions of the pleading record in the chapter 7 case are included in the admitted exhibits.  For completeness, however, the Court takes judicial notice of its files in that chapter 7, Case No. 05-21306-TLM.  Fed. R. Evid. 201; *see also* Fed. R. Evid. 801(d) (assertions in a debtor's schedules made under penalty of perjury may be considered by the Court as evidentiary admissions); *In re Martell*, 349 B.R. 233, 234 n.1, 05.2 I.B.C.R. 27 n.1 (Bankr. D. Idaho 2005) (citing *In re Moore*, 01.4 I.B.C.R. 147, 149 n.7 (Bankr. D. Idaho 2001)); *In re Webb*, 03.1 I.B.C.R. 25, 26, 2002 WL 33939737, *4 (Bankr. D. Idaho 2002).  Pleadings and documents in the chapter 7 case are identified in this Decision by their docket number ("Doc. No.").

[17]   Both Idaho and California are community property states.  Section 541(a)(2) makes "all interests of the debtor and debtor's spouse in community property as of the commencement of the case" property of the estate.

MEMORANDUM OF DECISION - 9

Debtor claimed a homestead exemption in the Pine Street Property, which she described as "residence."  *Id*. at sched. C.

At the time of the filing of the petition, Debtor did not live at the Pine Street Property.  In fact, she "never lived there."  Ex. 301 at 27.  At the time of the filing of the bankruptcy, Debtor lived at the Terrill Loop Property.

On the SOFA, in response to question no. 10, asking Debtor to list all other property transferred within one year immediately preceding the commencement of this case, Debtor indicated "none."  Doc. No. 1 at SOFA.   In response to question no. 7, asking Debtor to list all gifts or charitable contributions made within one year before the bankruptcy, except ordinary and usual gifts to family members less than $200.00, Debtor also indicated "none."  *Id*.  The April 20, 2005, Quitclaim Deed of the Terrill Loop Property is not disclosed in these SOFA responses, nor anywhere else in the filing.[18]

On April 21, 2005, the day after Debtor's Quitclaim Deed to Jae, Murrietta signed an answer to Axtman's complaint.  Ex. 301 at 21-22.  Apparently, Murrietta asserted a "cross-claim" against his co-defendant, Debtor.  This claim of Murrietta was listed in Debtor's schedules, *see* Doc. No. 1 at sched. F ("breach of contract lawsuit"), and referenced in her SOFA.  *See* Doc. No. 1 at SOFA, response to

---

[18]   Debtor testified that she told Smith not only that she resided at the Terrill Loop Property but also that she had transferred it to Jae.  Smith denied the former assertion, and indicated that, if Debtor had told him of the property transfer, it was after the discharge had been entered.

MEMORANDUM OF DECISION - 10

question no. 4 ("Axtman vs Murrietta and Fehrs/ Counter/Cross Claim Murrietta
vs Fehrs, CV 05-119").

### G.    Debtor's § 343 examination

On September 23, 2005, Trustee conducted a § 341(a) meeting of creditors
in Debtor's case.  Doc. No. 8 (meeting minutes).  At that time, Debtor was placed
under oath and examined under § 343.  Debtor affirmed the accuracy of her
petition and schedules and indicated no changes were required.  Ex. 200 at 4.

Responding to inquiries by Axtman's attorney, Debtor indicated she was
living at the Terrill Loop Property.[19]  Debtor also testified that she did not
"currently own" that property, and that it "belongs to my son."  *Id.* at 10.
Responding to Trustee, she said that she had transferred the property to her son
"[j]ust after he graduated," in "June of this year [2005]" by "signing a deed."  *Id.* at
11-12.[20]

There were no amendments made to Debtor's schedules or SOFA after the
§ 341(a) meeting.  Debtor claims that she discussed the need for amendments with
her attorney, Smith, and that he agreed to "take care of it."  While she never saw or

---

[19]  Ex. 200 at 8.  While the transcription of testimony at the § 341(a) meeting states "117
Tara Loop," there is no question that the reference is to what this Decision calls the Terrill Loop
Property.

[20]  Debtor's testimony continued with discussions of other real property transfers within a
year of filing that were likewise undisclosed.  Ex. 200 at 12-14.  None of these are at issue in
Trustee's fraudulent transfer action.  Plaintiffs, however, view them as probative of fraudulent
intent for purposes of the discharge revocation actions.

MEMORANDUM OF DECISION - 11

signed any amended schedules or statements, she says she "assumed it was corrected." Smith testified that he did not recall these discussions or agreeing to amend the schedules.

### H.    Discharge

The chapter 7 docket shows no activity after the § 341(a) meeting until November 23, 2005, when Debtor received a chapter 7 discharge. Doc. Nos. 9, 10.

### I.    Sale of Terrill Loop Property

Less than four months after the discharge, on March 9, 2006, a warranty deed was executed conveying the Terrill Loop Property to Harley Johansen and Nancy Johansen. Ex. 108. This deed was recorded in the Shoshone County records the following day, March 10, 2006, as Instrument #429454. *Id.* The grantor under the warranty deed is Jae B. Avery and the deed is signed: "Jae B. Avery by Vicki Fehrs Heard his attorney in fact."[21]

The total sales price for the Terrill Loop Property was $47,927.95. Ex. 109. After deducting closing costs, net proceeds of $44,997.43 were realized. *Id.*[22] Those proceeds were deposited into Debtor's personal bank account. Ex. 111.

---

[21] A general power of attorney was executed by Jae Avery to "Vicki Fehrs Heard" on February 15, 2006. Ex. 107. The power of attorney was limited to "real estate transactions" and noted that "[p]roceeds from *this transaction* are to be paid to Vicki Fehrs Heard as I [*i.e.*, Jae] will be in Japan for the next two years." *Id.* (emphasis supplied). That document was recorded as Instrument # 429453, records of Shoshone County, on March 10, 2006. *Id.*

[22] *See also* Ex. 110 (check, made payable to "Jae B. Avery by Vicki Fehrs Heard, Attorney in Fact.")

MEMORANDUM OF DECISION - 12

Debtor testified that she gave $200.00 of the proceeds of the Terrill Loop Property to Jae, and kept the balance.

Debtor never advised Trustee of this transaction. She says she advised Smith about it, and that he told her the Terrill Loop Property was "protected under the homestead" and it could be sold. Smith testified he had no recollection of such a conversation, and stated that he had never in his practice claimed a homestead on property that had been transferred by a debtor or was not at filing in the debtor's name.

### J.    Debtor purchases Spokane Valley Property

On March 27, 2006, less than two weeks after the sale of the Terrill Loop Property, Debtor purchased real property located at 6605 East 11th Ave., Spokane Valley, Washington (the "Spokane Valley Property"). The recorded statutory warranty deed conveys the Spokane Valley Property to "Vicki J. Fehrs-Heard, a married woman." Ex. 113.[23]  Debtor made a $23,792.13 down payment on the Spokane Valley Property using the Terrill Loop Property proceeds, and spent the balance of the proceeds.

---

[23]  Plaintiffs note that Debtor's prebankruptcy transfers all use the name "Vicki Fehrs," *see* Exs. 102, 103, 301 (at internal Exs. 6, 7), and 302, as did the petition, Doc. No. 1 ("Vicki Fehrs, fka Vicki Heard"). Following bankruptcy, they pointedly observe, she used the name "Vicki Fehrs-Heard." *See* Exs. 107, 108, 110, 113. Debtor admitted that her drivers license and Social Security identification all stated "Vicki Fehrs" and that "Vicki Fehrs Heard" was used only after bankruptcy.

MEMORANDUM OF DECISION - 13

### K.      Commencement of Murrietta's adversary proceeding

On September 7, 2006, Murrietta filed an complaint seeking revocation of

Debtor's discharge "pursuant to 11 U.S.C. § 727(d)."  Adv. No. 06-07020-TLM,

Doc. No. 1.  Debtor answered through Smith, who subsequently withdrew from

representation.  On September 7, 2007, Murrietta filed an amended complaint[24]

and Debtor answered *pro se*.  *Id*., Doc. Nos. 28, 29.  After appearing for Debtor a

few months later, attorney Cameron L. Phillips filed an amended answer to the

amended complaint.  *Id*., Doc. No. 50.

### L.      Trustee's reports, and the closing and reopening of the case

In the chapter 7 case, Trustee filed a "Case Report" on August 10, 2007,

indicating his ongoing review of "documentation regarding possible fraudulent

actions by the debtor."  Doc. No. 15.  He there indicated that the date of filing of a

final report and account was unknown.  However, less than a week later, Trustee's

report of no distribution was filed on August 16, 2007.  Doc. No. 16.  The Court

approved the report on the same day, and the estate was closed.  Doc. No. 17.

Less than a week after that, on August 22, 2007, Trustee moved to

withdraw his report of no distribution on the grounds that he had received

information that Debtor "may have received funds post-petition pertaining to a

---

[24]  Neither Murrietta's original nor amended complaint specified which part of § 727(d) was relied upon, though the allegations mostly addressed obtaining discharge through fraud.  *See* § 727(d)(1).

MEMORANDUM OF DECISION - 14

pre-petition asset." Doc. No. 19. The Court granted Trustee's request and

reopened the case on August 23, 2007. Doc. No. 21. The Order reopening the

case indicated that it had been "erroneously closed." *Id.* Trustee was appointed to

the reopened case and his request to withdraw his report of no distribution was

granted. *Id.*

### M. Commencement of Trustee's adversary proceedings

#### 1. Fraudulent conveyance

On August 23, 2007, Trustee filed a complaint to avoid the April 2005

transfer of the Terrill Loop Property as a fraudulent transfer under

§§ 548(a)(1)(A) and (B). Adv. No. 07-07032-TLM, Doc. No. 1.[25] This adversary

proceeding was brought solely against Debtor. Trustee's complaint prays that the

"Transfer" (defined by Trustee in the complaint as the transfer of the Terrill Loop

Property on April 20, 2005 by the Quitclaim Deed, *id.* at 2) "be avoided" and:

> Since after the Transfer the Property was subsequently transferred to a
> BFP, that the Debtor is liable to the Plaintiff for the entire net proceeds,
> $44,997.43, derived from the Sale.

*Id.* at 4-5.

---

[25] The "counts" of the complaint sound under these two Bankruptcy Code provisions.
*Id.* at 4. These two provisions address intentionally fraudulent and constructively fraudulent
transfers respectively. However, in the underlying allegations, Trustee also contends that Idaho
fraudulent transfer authorities, *see* Idaho Code §§ 55-913, 55-914, are applicable and that
avoidance is therefore also sought under "§ 544(a)(1) and (a)(2)." *Id.* Those provisions are inapt
to fraudulent conveyance, and the intended reference would appear to be § 544(b)(1) and (2).

MEMORANDUM OF DECISION - 15

### 2.     Discharge revocation

On the following day, August 24, 2007, Trustee filed a complaint to revoke

Debtor's November 23, 2005, discharge pursuant to §§ 727(d)(1) and (2).  Adv.

No. 07-07033-TLM, Doc. No. 1.  The contentions under § 727(d)(1) relate to the

allegedly fraudulent failure to disclose the transfer of the Terrill Loop Property and

another parcel of real property, and the contentions under § 727(d)(2) argue that

the proceeds of the sale of the Terrill Loop Property constituted property of the

bankruptcy estate that Debtor obtained and failed to report or deliver to Trustee.

Other factual matters will be addressed, as needed, in the following

discussion.

## DISCUSSION AND DISPOSITION

Though sharing a common record, the three adversary proceedings raise

issues that must be separately evaluated and resolved.

### A.     Trustee's discharge revocation action (Adv. No. 07-07033-TLM)

#### 1.     Trustee's § 727(d)(1) action is time-barred

Section 727(d)(1) provides that the court shall revoke a discharge if "such

discharge was obtained through fraud of the debtor, and the requesting party did

not know of such fraud until after the granting of such discharge."  § 727(d)(1).

Trustee expressly asserts a right to relief under this section.

However, under § 727(e)(1), an action to revoke a discharge under

§ 727(d)(1) must be brought within one year after discharge is granted.  In the

MEMORANDUM OF DECISION - 16

present case, Debtor's discharge was granted on November 23, 2005.  Trustee's

§ 727(d)(1) cause of action in Adv. No. 07-07033-TLM was filed on August 24,

2007.  This is more than one year after Debtor's discharge was entered, and

Trustee would appear to be time-barred from proceeding under § 727(d)(1).[26]  This

Court, in fact, previously held such a bar applicable to a trustee's § 727(d)(1)

action.  *See Krommenhoek v. Covino (In re Covino)*, 241 B.R. 673, 677 n.6, 99.4

I.B.C.R. 138, 139 n.6 (Bankr. D. Idaho 1999).

However, in this case, Debtor never raised any objection to the

maintenance of the action on the basis that it was barred under § 727(e)(1).

Trustee argues that bar under § 727(e)(1) is in the nature of a statute of limitations

and, thus, is an affirmative defense that must be affirmatively raised by a

defendant.  *See* Fed. R. Civ. P. 8(c)(1), incorporated under Fed. R. Bankr. P.

7008(a).  Trustee consequently sees this defense as waived by Debtor.[27]

Subsequent to *Covino*, the Supreme Court issued its decision in *Kontrick v.

Ryan*, 540 U.S. 443 (2004).  In *Kontrick*, a unanimous court held that the time

limit provided under Fed. R. Bankr. P. 4004(a) for objecting to a debtor's

discharge was not "jurisdictional" and, thus, a debtor forfeited the right to rely on

---

[26]  Murrietta's § 727(d) action was commenced on September 7, 2006, within one year of
the November 23, 2005 discharge, and no § 727(e)(1) issue is presented.

[27]  Trustee and Debtor made short arguments at the close of trial when the Court raised
the § 727(e)(1) question.  Neither had previously mentioned or addressed it, and the parties have
not provided the Court with any authorities on the matter.

MEMORANDUM OF DECISION - 17

this time bar by failing to seasonably raise it.  540 U.S. at 447, 453-56.[28]  This

conclusion flowed from the fact that the deadlines in "claim-processing rules" like

Rule 4004(a) and 9006(b) "do not delineate what cases bankruptcy courts are

competent to adjudicate."  *Id.* at 454.  Then, noting that Kontrick had failed to

raise the time constraints of Rules 4004(a) and (b) and 9006(b)(3) in pleadings

responsive to Ryan's complaint, the Supreme Court explained how the defense

was lost.  *Id.* at 459-60 (addressing Fed. R. Civ. P. 12(b), incorporated by Bankr.

P. 7012, which operates to waive defenses not raised by motion or responsive

pleading, unless protected by Rule 12(h)(2) or (3), and that time prescriptions are

not among those defenses so protected.)

The distinction drawn in *Kontrick* between time bars in the Federal Rules of

Bankruptcy Procedure and those in the Bankruptcy Code informs *Car Care*

*Center of Crystal Lake, Ltd. v. Miller (In re Miller)*, 336 B.R. 408 (Bankr. E.D.

Wis. 2005), the only post-*Kontrick* decision directly addressing both § 727(e) and

*Kontrick* that the Court has located.[29]

In *Miller*, the court identified the issue presented as "whether the one-year

---

[28]  The court criticized the "less than meticulous" use of the term "jurisdictional" which actually prescribes "the classes of cases (subject matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority."  540 U.S. at 454-55.

[29]  *Fickling v. Flower, Medalie & Markowitz, Esqs.* (*In re Fickling)*, 361 F.3d 172, 177 (2nd Cir. 2004), is a decision issued about 45 days after (but without discussing) *Kontrick*.  It held that a creditor "forfeited" the right to seek revocation under § 727(d)(1) for alleged fraud "when it failed to seek revocation within one year of the order of discharge, as required by statute."

MEMORANDUM OF DECISION - 18

deadline to file a complaint to revoke discharge under 11 U.S.C. § 727(e) is

jurisdictional or is in the nature of a statute of limitations, which is waivable and

extendable."  336 B.R. at 410.  *Miller* concludes that it is not only jurisdictional,

the language of the Code provision is clear on its face and should be enforced

according to its terms.  Noting that § 727(e) announces an absolute one year limit

for discharge revocation actions, and contains no provision for extension (unlike

Rule 4004(a) which can be extended upon timely motion under Rule 9006(b)(3)),

the court found that it operated to bar an untimely complaint.  *Id.* at 411-14.  In

doing so, the court rejected the idea that the bar could be "equitably tolled" or that

it could be extended by the parties' stipulation, because jurisdiction cannot be

conferred on a court by agreement of the parties.  *Id.*[30]

    A respected treatise states that § 727(e)(1) "is not a mere statute of

limitations, but an essential prerequisite to the proceeding."  6 Collier on

Bankruptcy, ¶727.16[1] at 727-78.3 (Alan N. Resnick & Henry J. Sommer eds.,

rev. 15th ed. 2005) (citations omitted).  It further notes the operation of Fed. R.

Bankr. P. 9024.  *Id.*  That Rule, in making Fed. R. Civ. P. 60(b) applicable to

---

[30] Prior to *Kontrick*, the district court in *Dean v. McDow*, 299 B.R. 133 (E.D. Va. 2003),
held that § 727(e) was a nonjurisdictional statute and, being in the nature of a statute of
limitations, was waived by a debtor failing to raise it in her answer or responsive pleading.  (The
issue of untimeliness was raised by the debtor for the first time on appeal from a bankruptcy court
decision revoking her discharge.)  *Id.* at 138-39.  The court's decision was based in part on
*Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244 (9th Cir. 1994).  The court stated: "Although
*Farouki* was decided in the context of Bankruptcy Rule 4004(a), rather than § 727(e)(1), there is
nothing in [debtor's] brief or *Farouki* itself to indicate that the dischargeability time limitation of
the former should be treated differently from the latter."  *Id.* at 138.  Of course, both *Dean* and
*Farouki* were prior to *Kontrick*.

MEMORANDUM OF DECISION - 19

bankruptcy cases, specifically provides that "a complaint to revoke a discharge in

a chapter 7 liquidation case may be filed only within the time allowed by § 727(e)

of the Code," thus emphasizing the concrete nature of the bar.[31]

In consideration of these authorities, the Court concludes that Trustee's

argument that the time limitation of § 727(e)(1) is in the nature of a statute of

limitations and an affirmative defense waived by Debtor's failure to assert it, is not

well taken.  This time limitation on seeking revocation of discharge is a matter of

statute, not rule.  Whether it should be characterized as "jurisdictional" or not,

Congress' expression of finality to revocation actions under § 727(e)(1) is clearly

stated.  "Where the statutory language is plain, 'the sole function of the courts – at

least where the disposition required by the text is not absurd – is to enforce it

according to its terms.'"  *Maney v. Kagenveama (In re Kagenveama)*, ___ F.3d

___, 2008 WL 2485570, at *2 (9th Cir. June 23, 2008) (quoting *Lamie v. United

States Tr.*, 540 U.S. 526, 534 (2004)).

The Court concludes that § 727(e)(1) establishes a firm bar on discharge

revocation actions.[32]  Trustee's cause of action under § 727(d)(1) is untimely

---

[31]   *See also Towers v. Boyd (In re Boyd)*, 243 B.R. 756, 763-64 (N.D. Cal. 2000) (noting
the Rule 9024 exception regarding § 727(e) time limits, and also holding § 727(e) not subject to
equitable tolling as the same "is not permissible where it is inconsistent with the text of the
relevant statute.") (citation omitted).

[32]   As the Supreme Court stated in another context: "Deadlines may lead to unwelcome
results, but they prompt parties to act and they produce finality."  *Taylor v. Freeland & Kronz*,
503 U.S. 638, 644 (1992).

MEMORANDUM OF DECISION - 20

under § 727(e)(1) and will be dismissed.[33]

### 2. Trustee's § 727(d)(2) action is not time barred, but is fatally flawed

Trustee also asserts a cause of action under § 727(d)(2), contending that the funds Debtor personally obtained from the sale of the Terrill Loop Property and utilized in the purchase of the Spokane Valley Property represented property of the estate, and that Debtor failed to report the acquisition of those funds, or to surrender those funds, to Trustee.

### a. Trustee's § 727(d)(2) claim is not time-barred

The first threshold issue echoes that discussed above regarding the action under § 727(d)(1), and relates to the existence of a time bar on asserting a claim for discharge revocation. An action under § 727(d)(2) must be brought "before the later of – (A) one year after the granting of such discharge; and (B) the date the case is closed." *See* § 727(e)(2).

Initially, the Court finds that Trustee's arguments that § 727(e)(2) should be viewed as a waivable affirmative defense in the nature of a statute of limitations no more compelling than those arguments were in regard to § 727(e)(1). There is no reason to apply a different analytical approach to the issue for paragraph (2) of subsection (e) than for paragraph (1) of the same subsection. Trustee's argument

---

[33]   Given this conclusion, the Court need not consider whether Trustee can satisfy the § 727(d)(1) requirement of lack of knowledge of facts regarding Debtor's fraud prior to discharge given the disclosures made in testimony at the § 341(a) meeting.

MEMORANDUM OF DECISION - 21

regarding Debtor's waiver of the § 727(e)(2) defense is therefore rejected.

Trustee relies on a second proposition to support his § 727(d)(2) cause in the face of § 727(e)(2)'s limitations. He argues that the closing of the case on August 16, 2007, did not create a bar under § 727(e)(2)(B) because that closing was nullified or negated by the reopening of the case by Order on August 23, 2007, Doc. No. 21.[34] That Order indicates that the case and estate were "erroneously closed" and that closing was due to "administrative error." However, as that Order was entered *ex parte*, the Court will not rely solely on its characterization therein but consider further the nature of the closing and whether it forms the predicate for a § 727(e)(2)(B) bar.

The record in Case No. 05-21306-TLM makes clear that Trustee's filing of a report of no distribution was an error; it followed only days after a case status report indicating that investigation into Debtor's possible fraudulent conduct was ongoing. Further, Trustee acted to immediately correct the patently inadvertent error in filing the report of no distribution by withdrawing that report and seeking entry of an order reopening the chapter 7 case.

Cases once closed may be reopened under § 350(b) "to administer assets, to

---

[34] Many of the decisions on § 727(e) consider assertions of "equitable tolling," which is an argument that the time bars can be extended if the fraudulent conduct of the debtor is concealed and not discovered. As noted in Collier: "Like the time limit of section 727(e)(1), this time limit [in § 727(e)(2)] is not subject to equitable tolling." 6 Collier on Bankruptcy ¶727.16[2] at 727-78.4. *See also In re Boyd*, 243 B.R. at 764 (discussing and rejecting equitable tolling concept). But the theory of equitable tolling is not advanced by Trustee, nor is it relied upon by the Court.

MEMORANDUM OF DECISION - 22

accord relief to the debtor, or for other cause." There is no time limit on seeking

reopening of a properly closed case. There is considerable doubt, though, that

such a § 350(b) reopening negates the effect of the prior closure, such as, for

example, the abandonment of assets that were properly scheduled but never

administered prior to closing. *See DeVore v. Marshack (In re DeVore)*, 223 B.R.

193, 198 (9th Cir. BAP 1998) (holding property that was technically abandoned

under § 554(c) was not brought back into estate by virtue of reopening the case).

And in *Menk v. LaPaglia (In re Menk)*, 241 B.R. 896 (9th Cir. BAP 1999), the

Panel noted that the consequences of closing relate primarily to the status of

property and the ability to recover property for the estate, and observed that

"[c]losing also terminates many of the trustee's avoiding and recovery powers . . .

[a]nd it terminates two of the three statutory theories for revoking a discharge. 11

U.S.C. § 727(e)(2)." *Id.* at 911. It concluded that "[r]eopening the case does not

undo any of the statutory consequences of closing." *Id.* at 913.

However, this litigation does not present the typical scenario addressed

under the § 350(b) authorities. First, there was no request made "under" § 350(b)

and that authority was not cited in the Court's Order. *See* Doc. Nos. 19, 21.

Second, the closing order here was entered but then almost immediately set aside

on the basis that the report of no distribution (which triggers an order entered by

the clerk under this Court's delegation of authority by General Order to the clerk

to enter certain uncontested orders) was erroneously filed. In practical effect,

MEMORANDUM OF DECISION - 23

Trustee's request to withdraw that report and for entry of an order such as Doc. No. 21 was predicated on the principle that the Court could correct an error.

Recently the Bankruptcy Appellate Panel had occasion to consider the bankruptcy court's equitable power to revisit and reconsider its orders. *See Woods & Erickson, LLP v. Leonard (In re AVI, Inc.)*, BAP No. NV-07-1266, ___ B.R. ___, 2008 WL 2503636, at *5 (9th Cir. BAP June 13, 2008). The Panel notes not only that such equitable power exists but that the Ninth Circuit "has observed that the court's discretion to revisit past orders is broad in the absence of 'vested' rights." *Id.* (citations omitted). Because exercise of such discretion is an equitable proposition, the existence of "intervening equities, potential hardship to other persons, and prejudice to a party" should be considered. *Id.* (citations omitted).

In the present situation, the relief from the closing order was sought within a clearly reasonable time, only some six days.[35] There is nothing to indicate any intervening equities, hardship or prejudice. Had not these erroneous events, covering a total of two weeks occurred, Debtor would have faced the possibility of a § 727(d)(2) action for the duration of the case, until its intentional closing occurred. The error in closing was patent, and quickly addressed and remedied, and there were no "vested" rights as a result of the error.

The intended effect, and the actual effect, of the Order of August 23, 2007,

---

[35] Trustee's report of no distribution and the closing order were filed on August 16. The withdrawal of that report was on August 22 and the Order was entered August 23.

MEMORANDUM OF DECISION - 24

Doc. No. 21, was to restore the case as if the closing order had not been entered.

The Court concludes there is no bar under § 727(e)(2) to the maintenance of

Trustee's § 727(d)(2) complaint.[36]

### b.     Trustee's § 727(d)(2) action is otherwise defective

Though not time-barred, there is a separate impediment to Trustee's action.

Trustee's cause under § 727(d)(2) requires proof that Debtor "acquired property

that is property of the estate, or became entitled to acquire property that would be

property of the estate, and knowingly and fraudulently failed to report the

acquisition of or entitlement to such property, or to deliver or surrender such

---

[36]   Finally, on this subject, the Court notes another alternative approach to considering what constitutes "closing" under § 727(e)(2)(B).  In *Davis v. Johnson (In re Johnson)*, 187 B.R. 984 (Bankr. S.D. Cal. 1995), the court rejected equitable tolling as a way to circumvent the time bar.  But it also concluded and stated as follows on an issue not raised by the trustee in that case, which was whether the reopening of the case within one year of its closing "interrupted" the running of the § 727(e)(2) limitation period:

> The intent of Congress was to provide a point after which the debtor would have a fresh start, as earlier discussed.  In the instance of a cause of action under § 727(d)(2), Congress contemplated that if no action were taken for more than one year after the later of the date of discharge or the closing of the case, then the debtor's discharge would no longer be revocable.  If the later event were entry of the discharge, the party would have to commence the revocation proceeding within one year thereafter.  When the later event is the date of closing of the case, however, it is clear that Congress understood that a case could be reopened because it provided express authority for doing so.  11 U.S.C. § 350.  If the case was closed, and remained closed for more than one year, the bar of § 727(e)(2) would apply.  However, if the case is reopened within the one year from closing, the case is no longer closed and the running of the one year period should be tolled.

*Id.* at 989.  The problem with this interpretation, and the reason this Court does not embrace it, is that it seems to read § 727(e)(2)(B) as "*one year after* the date the case is closed" rather than just "the date the case is closed.  The concept of a one year period appears, from the language of the Code, to apply *only* to the period under § 727(e)(2)(A), *i.e.*, "one year after the granting of the discharge."  It is that easily calculated date (discharge date plus one year) that is then compared to the "date the case is closed" to determine which is the later.

MEMORANDUM OF DECISION - 25

property to the trustee[.]"  Trustee's § 727(d)(2) assertions are aimed at the

proceeds of the sale of the Terrill Loop Property, the complaint in Adv. No. 07-

07033-TLM specifically alleging: "The Debtor acquired property that is property

of the estate, by taking the proceeds from the Sale of the Property and using them

as a down payment on the Spokane [Valley] Property[.]"  *Id.* at 4, ¶22.

The problem is that the proceeds from the sale of the Terrill Loop Property

have not been proven to be "property of the estate" which is defined in § 541(a)(1)

as "all legal or equitable interests of the debtor in property as of the

commencement of the case."

Defining "property of the estate" is a question of federal law, however, the

nature and extent of a debtor's interest in property is determined by application of

state law.  *In re Woods*, 386 B.R. 758, 761, 08.2 I.B.C.R. 61, 62 (Bankr D. Idaho

2008) (citing *Butner v. United States*, 440 U.S. 48, 55 (1979); *Foothill Capital

Corp. v. Clare's Food Mkt., Inc. (In re Coupon Clearing Serv., Inc.)*, 113 F.3d

1091, 1099 (9th Cir. 1997)).  *See also Frazer v. Drummond (In re Frazer)*, 377

B.R. 621, 626-27 (9th Cir. BAP 2007).  Section 541(a)(1) focuses the inquiry on

the rights of the debtor in property as of the date of the petition for relief.

Recall, the fraudulent conveyance contentions of Trustee here are

predicated on the fact that Debtor executed and recorded a Quitclaim Deed to the

Terrill Loop Property on April 20, 2005.  Ex. 103.  Trustee, through cross-

examination of Debtor, established that even she understood the effect of a

MEMORANDUM OF DECISION - 26

quitclaim deed is to transfer all interests of the grantor to the grantee.

Thus, on the date of the commencement of the case, Debtor no longer had an ownership interest in the Terrill Loop Property, having effected a transfer of it to Jae by the Quitclaim Deed.  It was at no time transferred back to Debtor.  When that property was later transferred to the Johansens, it was transferred through a warranty deed by Jae Avery as grantor.  Ex. 108.[37]  As a matter of state law, made applicable to the § 541(a)(1) question, Debtor had no interest in the Terrill Loop Property at the time the bankruptcy commenced.

It is true that property of the estate also includes "[a]ny interest in property that the trustee recovers under section . . . 550 . . . of this title," and "[a]ny interest in property preserved for the benefit of or ordered transferred to the estate under section . . . 551 of this title."  *See* §§ 541(a)(3) and (4).  However, the avoidance of the transfer and the § 550 recovery or § 551 preservation are conditions precedent to operation of §§ 541(a)(3) and (4).  This is not a case where Trustee avoided a transfer and established a § 550 recovery, and Debtor subsequently obtained and failed to report or deliver to Trustee that § 541(a)(3) property of the estate, giving rise to an action to revoke discharge under § 727(d)(2).

The Court is aware that the Fifth Circuit has included purportedly

---

[37]   The Court is aware that Jae's act was effected through Debtor signing the documents for him by virtue of the power of attorney.  *See* Ex. 107.  However, the power of attorney gave Debtor the ability to act *for* Jae, and did not change the ownership of or interests in the Terrill Loop Property.

MEMORANDUM OF DECISION - 27

fraudulently transferred property as property of the estate prior to the trustee's actual recovery of such property. *Am. Nat'l Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.)*, 714 F.2d 1266, 1275 (5th Cir. 1983) (finding such property falls within § 541(a)(1)).[38]   This approach was rejected by the Second Circuit in *FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125 (2d Cir. 1992).  As stated in that case:

> If property that has been fraudulently transferred is included in the § 541(a)(1) definition of property of the estate, then § 541(a)(3) is rendered meaningless with respect to property recovered pursuant to fraudulent transfer actions.  Further, the inclusion of property recovered by the trustee pursuant to his avoidance powers in a separate definitional subparagraph clearly reflects the congressional intent that such property is not to be considered property of the estate until it is recovered.

*Id.* at 131 (quoting *In re Saunders*, 101 B.R. 303, 305 (Bankr. N.D. Fla. 1989)).[39] *See generally* M. Cedillos, "Categorizing Categories: Property of the Estate and Fraudulent Transfers in Bankruptcy," 106 Mich. L. Rev. 1405 (May 2008) (addressing issues and concluding that principles of statutory construction and practical policy considerations dictate that the Second Circuit's is the more sound and better reasoned interpretation).

---

[38]   The Fifth Circuit has confirmed the approach in subsequent cases, including *Cullen Ctr. Bank & Trust v. Hensley (In re Criswell)*, 102 F.3d 1411, 1417 (5th Cir. 1997).

[39]   *See also French v. Liebmann (In re French)*, 440 F.3d 145, 152 n.2 (4th Cir. 2006) (noting split).  Though indicating no position, *id.*, the Fourth Circuit appeared to side with the Fifth Circuit, holding that "[b]y incorporating the language of § 541 to define what property a trustee may recover under his avoidance powers, § 548 plainly allows a trustee to avoid any transfer of property that *would have been* 'property of the estate' prior to the transfer in question – as defined by § 541 – even if that property is not 'property of the estate' *now*." *Id.* at 151.

MEMORANDUM OF DECISION - 28

In *Barclay v. Swiss Fin. Corp. Ltd. (In re Bankr. Estate of Midland Euro Exch. Inc.)*, 347 B.R. 708 (Bankr. C.D. Cal. 2006), the bankruptcy court addressed the divided authorities, noting that "the majority of the courts have concluded that property held by third-party transferees only becomes 'property of the estate' after the transfer has been avoided." *Id*. at 717-18 (citations omitted). Finding the reasoning of the majority approach "more logical and defensible," the court held "that allegedly fraudulent transfers do not become property of the estate until they are avoided." *Id*. at 718. The court also looked closely at the Fourth Circuit's analysis in *French*, concluding:

> [French's] reasoning apparently presumes that the debtor retains a "legal or equitable" interest in the property transferred pre-petition, or to paraphrase, that "property of the estate" includes property transferred but not yet recovered. It ignores the language in § 541(a)(1) and (a)(3) that the debtor must have an interest in the property "as of the commencement of the case" and that property of the estate includes "any interest in property that the trustee *recovers* under section . . . 550 . . . of this title." (emphasis added). When the plain meaning of the language of the statute is clear, the courts need only enforce it. This statute seems very clear to any ordinary reader: property that has been fraudulently transferred only becomes property of the estate when the transfer has been set aside.

*Id*. at 719.

The Court concludes that the approach taken in *Midland Euro Exch. Inc*. and by the Second Circuit in *Colonial Realty Co*. is the more persuasive.

Trustee's arguments presume that the traceable proceeds of the Terrill Loop Property were property of the estate and that Debtor became exposed to

MEMORANDUM OF DECISION - 29

§ 727(d)(2) liability when she obtained and did not report or surrender those

proceeds.  Trustee did not establish that the Terrill Loop Property was property of

the estate on the date of filing, August 29, 2005, given the Quitclaim Deed of April

20, 2005.  The proceeds were, thus, also not shown to be property of the estate.[40]

A ruling under § 550 or § 551 is prerequisite to using § 541(a)(3) or (4), and

property transferred that is only prospectively avoidable at filing does not fall

within § 541(a)(1).  Trustee failed to establish a required element of his

§ 727(d)(2) action, which is that Debtor "acquired property that is property of the

estate."  Trustee's complaint under § 727(d)(2) will be dismissed.

### B.    Trustee's avoidance action (Adv. No. 07-07032-TLM)

Trustee argues that Debtor's transfer of the Terrill Loop Property

constitutes an avoidable transfer under § 548(a)(1)(A) as one done with actual

intent to hinder, delay and defraud.  He also alleges it is avoidable under

§ 548(a)(1)(B) as a constructively fraudulent transfer in which Debtor received

less than reasonably equivalent value for a transfer made when she was insolvent.

*See* §§ 548(a)(1)(B)(i), 548(a)(1)(B)(ii)(I).[41]  The Court elects to consider the

§ 548(a)(1)(B) cause of action first.[42]

---

[40]  *Cf.* § 541(a)(6) (making "proceeds" of property of the estate also property of the estate).

[41]  Trustee also, as previously noted, relies on Idaho's Uniform Fraudulent Transfer Act, *see* Idaho Code §§ 55-913, 55-914, and the importation of those standards under § 544(b).

[42]  Section 548(a)(1)(B), as in effect when Debtor filed her case in August, 2005,
(continued...)

MEMORANDUM OF DECISION - 30

### 1.    Establishing avoidablility

There are several elements that must be established by a plaintiff to sustain a cause of action under § 548(a)(1)(B).  There must be a "transfer" of property of the debtor that occurs, for pre-BAPCPA cases, within one year of the filing of the bankruptcy petition.  The debtor must have received less than "reasonably equivalent value in exchange for the transfer" and the transfer had to have occurred when the debtor was insolvent or the debtor had to be rendered insolvent as a result of the transfer.  Plaintiffs bear the burden of proving all these elements in order to recover under § 548.  *Krommenhoek v. Natural Res. Recovery, Inc. (In re Treasure Valley Opportunities, Inc.)*, 166 B.R. 701, 703, 94 I.B.C.R. 55, 56 (Bankr. D. Idaho 1994).

-----

[42](...continued)
provides:

> (a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily –
> . . .
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

§ 548(a)(1)(B).  BAPCPA, *see* note 1 *supra*, extended the look-back period to two years, and made some other amendments to this section.

MEMORANDUM OF DECISION - 31

### a.    "Transfer"

The Code broadly defines transfer as every "mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with – (i) property, or (ii) with an interest in property." § 101(54). *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535 (1994), recognizes the applicability of § 101(54) to constructively fraudulent transfer assertions under § 548. *See also Hopkins v. D.L. Evans Bank (In re Fox Bean Co.)*, 287 B.R. 270, 281, 02.4 I.B.C.R. 185, 189 (Bankr. D. Idaho 2002) (same).

Here, Debtor owned the Terrill Loop Property. *See* Ex. 102. The granting of the Quitclaim Deed to Jae, Ex. 103, is a transfer of the Debtor's property for purposes of § 548(a)(1)(B).

When that transfer occurred (for the purposes of § 548) is governed by § 548(d). That section establishes the date of transfer as the date "when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee." *See* § 548(d)(1). In connection with the transfer of an interest in Debtor's real estate, such perfection requires recordation of the Quitclaim Deed. *See* Idaho Code §§ 55-601, 55-606, 55-812. That Deed was recorded in the Shoshone County real property records on April 20, 2005. Ex. 103. That, therefore, is the date of transfer. Such date was within one year of the Debtor's

MEMORANDUM OF DECISION - 32

August 29, 2005, bankruptcy filing.

### b.      "Reasonably equivalent value"

There is a two step process required to determine whether a debtor received a reasonably equivalent value.

First, it must be determined that the debtor received value. "Value is defined for purposes of section 548 of the Code as 'property, or the satisfaction or securing of a present or antecedent debt of the debtor[.]'" *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 595 (9th Cir. 1991) (quoting § 548(d)(2)(A)). A transfer is for value if one is the quid pro quo of the other. *Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.)*, 267 B.R. 602, 612 (8th Cir. BAP 2001) (citing 2 David G. Epstein, Bankruptcy § 6-49 at p. 33).

Second, the Court must determine whether that value was reasonably equivalent to what the debtor gave up. The determination of "reasonable equivalence" is largely a factual question and, in order to determine whether a fair economic exchange has occurred, the court must analyze all the circumstances surrounding the transfer in question. 5 Collier on Bankruptcy ¶ 548.05.[1][b] at 548-35. The determination of reasonable equivalence must be made as of the time of the transfer. *BFP*, 511 U.S. at 546; *Treasure Valley Opportunities*, 166 B.R. at 704; Collier, ¶ 548.05[1][b] at 548-38.

Whether a debtor received a reasonably equivalent value is analyzed from

MEMORANDUM OF DECISION - 33

the point of view of the debtor's creditors, because the function of this element is to allow avoidance of those transfers that result in a diminution of a debtor's prepetition assets. *Fox Bean Co.*, 287 B.R. at 281 (citing *Roosevelt v. Ray (In re Roosevelt)*, 176 B.R. 200, 206 and 208 (9th Cir. BAP 1994)). *See also Frontier Bank v. Brown (In re N. Merch., Inc.)*, 371 F.3d 1056, 1059 (9th Cir. 2004) (the "primary focus . . . is on the net effect of the transaction on the debtor's estate and the funds available to the unsecured creditors."); *Viscount Air Servs., Inc. v. Cole (In re Viscount Air Servs., Inc.)*, 232 B.R. 416, 435 (Bankr. D. Ariz. 1998) (noting that the focus is whether the net effect of the transaction has depleted the bankruptcy estate).

Debtor received, according to the Quitclaim Deed itself, $1.00 in return for the transfer of the Terrill Loop Property. That property was worth at least $14,000.00 according to the testimony establishing that Murrietta provided that amount for its purchase by Debtor in October, 2003. However, given the sale of the Terrill Loop Property for over $47,000.00 within just one year after the transfer to Jae, it's value at transfer was likely much higher than $14,000.00. Either way, Debtor clearly received less than reasonably equivalent value.

### c.    Insolvency

*Fox Bean Co.* indicates that the definition of insolvency in § 101(32) is used for § 548(a)(1)(B)(ii) purposes. 287 B.R. at 282. That definition for an individual such as Debtor, under § 101(32)(A), is that the sum of her debts is greater than all

MEMORANDUM OF DECISION - 34

of her property, at a fair valuation, exclusive of (i) property transferred, concealed

or removed with intent to hinder, delay or defraud her creditors and (ii) property

that may be exempted under § 522.

The transfer was made on April 20, 2005.  Little evidence was presented

directed to Debtor's financial condition on that date.  However, from what was

presented, the Court concludes that a prima facie case was made regarding

Debtor's insolvency.  Debtor failed to present any contrary evidence.

Debtor's schedules in August, 2005, reflect her condition on that date.  Her

assets included the Pine Street Property she valued at $10,000.00, and personal

property that she valued at a total of $3,570.00.  Doc. No. 1 at sched. A, B.  She

claimed exemptions of $13,535.00, *id.* at sched. C, leaving only $35.00 of non-

exempt value.[43]  She disclosed creditors holding claims of $540,303.00.  *Id.* at

sched. D, F.[44]  The SOFA filed on that same date did not reflect transfers within

the period between April 20 and filing, suggesting no significant change of

financial condition in that period, and supporting the conclusion that Debtor was

---

[43]  One might wonder why the homestead exemption Debtor claimed in the Pine Street
Property should be included in the § 101(32)(A)(ii) analysis given Debtor's admission she did not
live there.  However, the exemption was not objected to by Trustee or any creditor within the
time established under Fed. R. Bankr. P. 4003(b).  It is therefore allowed even if without a
colorable basis.  *Taylor*, 503 U.S. at 644; *Klein v. Chappell (In re Chappell)*, 373 B.R. 73, 77 (9th
Cir. BAP 2007).

[44]  The schedules included a $250,000.00 debt to Murrietta described as "breach of
contract lawsuit" and a similar amount to Axtman described as "alleged breach of
contract/alleged defamation."  *Id.* at sched. F.  Debtor did not schedule either as contingent,
unliquidated or disputed.  *Id.*  Though litigation was pending, debts include unliquidated claims.
*See* §§ 101(5), 101(12).

MEMORANDUM OF DECISION - 35

insolvent on April 20 just as she was on August 29.[45]

On balance, the evidence supports the conclusion that Debtor was insolvent on April 20 or became insolvent on that date as a result of the transfer of the Terrill Loop Property. *See* § 548(a)(1)(B)(ii)(I). For this reason, and because Debtor did not receive any appreciable value, much less reasonably equivalent value, the transfer of the Terrill Loop Property is avoidable under § 548(a)(1)(B).[46]

### 2.    Consequences of avoidability

Trustee seeks a judgment against Debtor for $44,997.43, the amount of proceeds deposited in Debtor's bank account from the sale of the Terrill Loop Property. Adv. No. 07-07032-TLM, Doc. No. 1 at 4-5. The approach raises interesting questions.

Having avoided a transfer, the Code prescribes the circumstances under which trustees may then recover the transferred property or its value for administration in the bankruptcy estate:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section . . . 548 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or,

---

[45]  There was testimony and documentary evidence about an April 29, 2005 transfer of property at 411 Hunter Street in Mullan from Debtor to a friend, Margi Smith. *See* Ex. 302. Debtor testified that she received nothing in return for this transfer. However, this does not suggest that she had additional assets on April 20 because Debtor also testified that the debts against the Hunter Street property were in excess of its value.

[46]  Given this conclusion, the Court is not required to address the cause of action for intentionally fraudulent transfer under § 548(a)(1)(A), or the cause under Idaho fraudulent conveyance law made applicable by § 544(b).

MEMORANDUM OF DECISION - 36

if the court so orders, the value of such property, from –
  (1) the initial transferee of such transfer or the entity for
whose benefit such transfer was made; or
  (2) any immediate or mediate transferee of such initial
transferee.

§ 550(a).

In this case, Trustee does not seek to recover "the property transferred" as

he recognizes that it has since been sold to the Johansens.  *See also* §§ 550(b) and

(e).  Trustee instead seeks to recover the "value of [the transferred] property."

§ 550(a).

In this case, Jae was the initial transferee.  Trustee does not seek relief

against him.  However, this Circuit's Bankruptcy Appellate Panel recently

acknowledged that § 550(a) is flexible, and allows the trustee to recover the value

of an avoided transfer from mediate and intermediate transferees even if the actual

transfer is not set aside as to the initial transferee.  *See In re AVI, Inc.*, 2008 WL

2503636, at *7-11.

Here, Debtor was a subsequent transferee under the reach of § 550(a)(2).

The initial transferee, Jae, sold the Terrill Loop Property to the Johansens,

converting that real property interest to cash.  He then allowed all the cash

proceeds (with the exception of $200.00) to be retained by Debtor, who became an

"immediate or mediate" transferee.[47]  Trustee adequately traced the proceeds of

---

[47]   The Code's approach gives a trustee an absolute right to recover from an initial
transferee, but provides a safe harbor for good faith subsequent transferees.  *See Hopkins v.*

(continued...)

MEMORANDUM OF DECISION - 37

sale into her hands, and established that the same represented "the value of such property" under § 550(a).

"[T]he purpose of § 550(a) is 'to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred.' . . . [C]ourts have liberally exercised their discretion and used the tools given by the statute to ensure that the estate is made whole." *USAA Fed. Sav. Bank v. Thacker (In re Taylor)*, BAP No. WW-07-1313, ___ B.R. ___, 2008 WL 2579100 (9th Cir. BAP June 20, 2008) (citations omitted). If ordering the return of the property transferred would require the unwinding of a real estate transaction and would injure innocent third parties, the court can instead enter a money judgment. *Id.* at *5 (citing *Wellington Apt., LLC v. Clotworthy (In re Wellington Apt., LLC)*, 350 B.R. 213, 247-48 (Bankr. E.D. Va. 2006)). Here, Trustee has not requested the unwinding of the transfer of the Terrill Loop Property but instead seeks a money judgment against Debtor in the amount of the sale proceeds realized by her.

Trustee's prayer for a judgment in the amount of $44,997.43 against Debtor will be granted under § 550(a)(2).

Further, given that the function of the judgment is to restore the estate to the financial condition that it would have enjoyed but for the improper transfer,

---

[47] (...continued)

*Cummins (In re Mason)*, 06.2 I.B.C.R. 17, 20 (Bankr. D. Idaho 2006) (citations omitted). Under the evidence, even though Debtor is a subsequent transferee, she does not qualify as one who obtained the property for value, acting in good faith, and without knowledge of the voidability of the transfer. *Id.* Debtor bore the burden of establishing these defenses to liability. *Id.*

MEMORANDUM OF DECISION - 38

the Court determines that prejudgment interest is appropriate.[48]  Debtor received

the proceeds of the fraudulently transferred Terrill Loop Property immediately

upon closing of the sale from Jae to the Johansens on March 10, 2006.  *See* Exs.

110, 111.  Absent interest from that date to the date of judgment, the estate is not

made whole.  *See Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 818

(9th Cir. 1994) (determining that an award of prejudgment interest in a § 548(a)

case is left to the sound discretion of the trial court and is awarded when necessary

to make the wronged party whole); *see also In re Aughenbaugh*, 02.4 I.B.C.R.

157, 163 n.16, 2002 WL 33939738, at *11 n.16 (Bankr. D. Idaho 2002).  The

proper rate of prejudgment interest is provided by Idaho Code § 28-22-104(1).

### C.   Murrietta's discharge revocation action (Adv. No. 06-07020-TLM)

Trustee's § 727(d)(1) cause will be dismissed as time barred under

§ 727(e)(1), and his § 727(d)(2) cause will be dismissed for other reasons, as

discussed *supra*.  However, Murrietta's § 727(d) adversary proceeding, Adv. No.

06-07020-TLM, was timely filed under § 727(e) and is properly before the Court

for decision.

As noted earlier, Murrietta does not specify what paragraphs of subsection

(d) are asserted.  However, consistent with the Court's ruling in regard to

---

[48]  *See* Fed. R. Civ. P. 54(c), incorporated by Fed. R. Bankr. P. 7054 ("Every [non-default] final judgment should grant the relief to which each party is entitled, even if that party has not demanded that relief in its pleadings.")

MEMORANDUM OF DECISION - 39

Trustee's suit, a cause of action for revocation under § 727(d)(2) based on the

fraudulent and knowing receipt of "property of the estate" does not exist on the

evidence and record here.  Thus, the Court evaluates the claims solely under

§ 727(d)(1).[49]

### 1.    Standards generally

Actions seeking to revoke discharge are to be "construed liberally in favor

of the debtor and strictly against those objecting to discharge."  *Hopkins v. Hugues*

*(In re Hugues)*, 349 B.R. 72, 77 (Bankr. D. Idaho 2006) (citing *First Beverly Bank*

*v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir. 1986), and  *Bowman v. Belt*

*Valley Bank (In re Bowman)*, 173 B.R. 922, 924 (9th Cir. BAP 1994)).  However,

a bankruptcy discharge is only for the "honest but unfortunate" debtor.  *Jett v.*

*Sicroff (In re Sicroff)*, 401 F.3d 1101, 1104 (9th Cir. 2005) (quoting *Grogan v.*

*Garner*, 498 U.S. 279, 287 (1991)); *see also Hugues*, 349 B.R. at 78.

A plaintiff must prove all requisite elements to revoke a discharge by a

preponderance of the evidence.  *Grogan*, 498 U.S. at 284; *Beauchamp v. Hoose*

*(In re Beauchamp)*, 236 B.R. 727, 730 (9th Cir. BAP 1999).

To prevail under § 727(d)(1), a plaintiff must prove two elements.  First, he

must establish that the discharge was obtained through the fraud of the debtor.

Second, the plaintiff must prove that he did not know of such fraud until after the

---

[49]   A third statutory provision, § 727(d)(3), is neither implicated nor argued by Murrietta.

MEMORANDUM OF DECISION - 40

granting of such discharge.  *See* § 727(d)(1).  *See also Neary v. Darby (In re Darby)*, 376 B.R. 534, 539 (Bankr. E.D. Tex. 2007) (noting a plaintiff's "burden of proving all of the facts upon which revocation is conditioned" including that "the debtor's fraud caused the discharge and that the plaintiff lacked knowledge of that fraud prior to the deadline for objecting to discharge").

### 2.      Debtor's fraud in obtaining the discharge

The first element of § 727(d)(1) requires proof "that the debtor committed 'fraud in fact.'  That is, fraud must be shown to have occurred in the procurement of the discharge, and sufficient grounds must have existed which would have prevented the discharge."  *Hugues*, 349 B.R. at 78 (citing *Bowman*, 173 B.R. at 925).  The "obtained through" language in § 727(d)(1) is "causation language . . . Fraud in the air will not suffice."  *White v. Nielsen (In re Nielsen)*, 383 F.3d 922, 925 (9th Cir. 2004). "Because a debtor is unlikely to testify directly that his intent was fraudulent, the courts may deduce fraudulent intent from all the facts and circumstances of the case."  *Devers v. Bank of Sheridan Montana (In re Devers)*, 759 F.2d 751, 754 (9th Cir. 1985); *Hugues*, 349 B.R. at 78.

*Hugues* notes that the grounds for denial of discharge are enumerated in § 727(a), and include a debtor's knowingly and fraudulently making a false oath in or in connection with the case, *see* § 727(a)(4)(A), and that was the basis there alleged by Hugues' trustee as grounds for revocation.  349 B.R. at 78.  Murrietta makes similar contentions in this case.

MEMORANDUM OF DECISION - 41

Murrietta argues that Debtor's lack of disclosure of the April 20, 2005, transfer of the Terrill Loop Property to her son and her false declaration of residency in the Pine Street Property, among other things, are knowingly and fraudulently made false statements that would defeat her right to discharge under § 727(a)(4)(A). The Court agrees.

The requisite false oath to deny a discharge under § 727(a)(4)(A) may involve "either an affirmatively false statement or an omission from the debtor's schedules." *Searles v. Riley (In re Searles)*, 317 B.R. 368, 377 (9th Cir. BAP 2004) (citation omitted). Collier states that "a common instance of 'false oath' is when a debtor declares that the schedule of property is 'true and correct' and it appears that the debtor has knowingly and fraudulently omitted assets from it." 6 Collier on Bankruptcy ¶ 727.04[2] at 727-42. Here, Debtor's schedules and SOFA contain false statements and material omissions.

As noted earlier, the petition lists Debtor's residence or street address as the Pine Street Property, and Debtor claimed a homestead exemption in that property, which she described as "residence." But Debtor never lived at the Pine Street Property. Ex. 301 at 27. In fact, she indicated in her deposition that the Pine Street Property was "just a big, old building" that was previously an old church, then a mortuary and an office for water service. *Id*. Also omitted in the SOFA is any disclosure of the April 20, 2005, transfer of the Terrill Loop Property to Jae, or the April 29, 2005, transfer of the Hunter Street property to Margi Smith,

MEMORANDUM OF DECISION - 42

both which occurred approximately four months prior to the bankruptcy filing.

Debtor falsely asserted her residence and homestead, and omitted these real

property transfers, notwithstanding her declaration that the information contained

in her petition, schedules and SOFA was true and correct.  *See* Doc. No. 1 at 2

(declaration regarding petition), 17 (declaration concerning Debtor's schedules),

21 (declaration regarding SOFA).  She later testified under oath at the § 341(a)

examination that they were true and correct.  *See* Ex. 200 at 4; *see also* Ex. 301 at

26.[50]

Debtor's first line of defense is typical in such situations.  She argues that

she did not act with fraudulent intent but that the errors and omissions were the

result of mistakes made by her counsel, Smith, and her reliance on him.  Generally,

a debtor who acts in reliance on the advice of counsel lacks the requisite intent

necessary to deny a discharge.  *Adeeb*, 787 F.2d at 1343.  However, the reliance on

counsel must be in good faith.  *Id.*  Further, for the defense to prevail, the item

must be omitted on the honest advice of counsel, to whom the debtor has disclosed

all pertinent facts.  *Abbey v. Retz (In re Retz)*, 364 B.R. 742, 758 (Bankr. D. Mont.

2007).  "[T]he advice of counsel is not a defense when it is transparently plain that

the property should be scheduled."  *Darby*, 376 B.R. at  541 (quotations omitted).

---

[50]   Although Debtor disclosed the real property transfers at the § 341(a) meeting, the
disclosures were in response to questions by Axtman's attorney and the Trustee.  Ex. 200 at 7-15.
The Court is not persuaded that Debtor would have disclosed the transfers but for the direct
questions.

MEMORANDUM OF DECISION - 43

Smith testified credibly that there was a two-hour "working session" during which he obtained the detailed information regarding Debtor's assets, liabilities and affairs necessary to prepare the bankruptcy paperwork. He indicated that this was slightly longer than his normal first meeting with debtors. He also indicated he typically holds, and held here, a second "finalization meeting" including a page-by-page review of the draft petition, schedules and statements.

Smith could not insert into the petition and other documents factual material without obtaining those facts from Debtor. He could not have inserted the Pine Street Property as a residence address on the face of the petition, or completed schedules A and C declaring ownership and claiming a homestead exemption in it, without input from Debtor. The proposition that Debtor disclosed, in good faith, all pertinent facts, and that Smith made an error in preparing the paperwork, was not credibly or persuasively advanced. In addition, Debtor never cogently or persuasively explained how the patent errors were not caught and identified by her in reviewing and signing the documents, or in any post-signing re-reading, or in her preparation for the § 341(a) meeting where she, under oath, reaffirmed the truthfulness and accuracy of the assertions she made.

The defense of honest reliance on counsel was not established.

There is additional circumstantial evidence supporting the conclusion that she obtained her discharge through fraud by knowingly and fraudulently making

MEMORANDUM OF DECISION - 44

false statements and omissions.[51]  In April, 2005, just a few months before filing

bankruptcy, Debtor transferred the Terrill Loop Property to Jae for $1.00 by a

Quitclaim Deed.[52]  The face of the Quitclaim Deed listed a California address for

Jae, even though he lived with Debtor at the Terrill Loop Property at that time.

The use of that address was never explained.

      The alleged rationale for the transfer was Debtor's desire to insulate herself

from liability for any improper actions by Jae while he was the sole individual

residing at that property.  However, his sole residence lasted all of a week.  The

transfer was not "reversed" by a quitclaim deed from Jae to Debtor when Debtor

returned and Jae left for the military, and when the rationale for the recorded

change of ownership no longer applied.

      Months later, in February, 2006, Debtor prepared and obtained Jae's

execution, not of a quitclaim deed but of a power of attorney, Ex. 107, thus

allowing her to effect a sale transaction in Jae's name.  When she used that power

of attorney to close the sale of the property to the Johansens, Debtor took for

---

[51]  *Devers*, 759 F.2d at 754 (circumstantial evidence may be used to establish fraudulent intent); *Hugues*, 349 B.R. at 78 (same).  *See also Fogal Legware of Switz., Inc. v. Wills (In re Wills)*, 243 B.R. 58, 64 (9th Cir. BAP 1999) (surrounding circumstances and "badges of fraud" may establish the necessary intent; such badges include (1) close relationship between transferor and transferee, (2) transfer in anticipation of pending suit, (3) debtor's poor financial condition at time of transfer, (4) that debtor transferred all or substantially all property, (5) whether assets remained to satisfy creditors, and (6) whether debtor received inadequate consideration for transfer.)

[52]  This was also after a lawsuit had been filed against her and Murrietta by Axtman.  It was also after she and Murrietta had separated (under either of their versions of the timing of the separation) and was one day before Murrietta cross-claimed against her in the Axtman suit.

MEMORANDUM OF DECISION - 45

herself virtually all the net proceeds of $44,997.43, except for $200.00 she says she gave to Jae. She then, two weeks later, used those proceeds to purchase the Spokane Valley Property, and spent the rest on her personal living expenses.[53]  In the power of attorney and sale documents, Debtor used the surname "Heard" or "Fehrs-Heard" which was unlike the name of "Fehrs" she used in the bankruptcy and prior to the bankruptcy.

The Court has considered the foregoing, and all other evidence, testimonial and documentary. It concludes that Debtor knowingly and fraudulently made false statements under oath that would result in denial of her right to discharge under § 727(a)(4)(A). Thus, Debtor's discharge was "obtained through . . . fraud" within the contemplation of the first element of the discharge revocation provision of § 727(d)(1). *Hugues*, 349 B.R. at 78.

### 3.      Murrietta's knowledge prior to discharge

However, even though the Court finds that Murrietta satisfied his burden under the first element of § 727(d)(1), it concludes that he did not satisfy the second element, which requires proof that he did not know of the fraud until after the discharge was granted.

As the statute itself expressly provides, an action under § 727(d)(1) requires that the requesting party lacked knowledge of the claimed fraud until after the

---

[53]  Debtor's testimony that Smith verbally okayed the sale of the Terrill Loop Property and advised Debtor that it was protected by a homestead exemption was not credible and was specifically contradicted by Smith.

MEMORANDUM OF DECISION - 46

granting of the discharge.  This lack of knowledge is "essential."  6 Collier on Bankruptcy ¶727.15[3] at 727-76 (citing *Bowman*, 173 B.R. at 922).  "[A] party requesting revocation of a discharge has the burden of proving its lack of knowledge of the fraud before discharge, and a failure to carry this burden is fatal to the party's case."  6 Collier on Bankruptcy ¶727.15[3] at 727-76.

The court in *Darby* held that "knowledge" of the fraud exists "when the party seeking revocation first becomes aware of facts such that he is put on notice of a possible fraud" and such a potential plaintiff must thereafter show "due diligence in investigating and responding to possible fraudulent conduct once he or she is aware of it or is in possession of facts such that a reasonable person in his or her position should have been aware of a possible fraud."  376 B.R. at 542-43 (citing *Lightfoot v. Landry (In re Landry)*, 350 B.R. 51, 56 (Bankr. E.D. La. 2006); *Anderson v. Vereen (In re Vereen)*, 219 B.R. 691, 696 (Bankr. D. S.C. 1997)).  *See also* Collier at ¶727.15[3] ("[A] creditor or trustee is required to have exercised diligence in investigating the facts during the case, especially after having been put on notice of possible fraud.")

In *Bowman*, this Circuit's Bankruptcy Appellate Panel held that dismissal of a revocation complaint is proper if the plaintiff, before discharge, knows facts such that he or she is put on notice of a possible fraud.  173 B.R. at 925 (citing *Mid-Tech Consulting, Inc. v. Swendra*, 938 F.2d 885, 888 (8th Cir. 1991)).  *See also Fokkena v. Peterson (In re Peterson)*, 356 B.R. 468, 476 (Bankr. N.D. Iowa

MEMORANDUM OF DECISION - 47

2006); *In re Thie*, 97.4 I.B.C.R. 110, 111 (Bankr. D. Idaho 1997).  Thus, such a

party placed on notice must before discharge diligently investigate any possible

fraudulent conduct.  *Bowman*, 173 B.R. at 925.

Debtor makes several attacks on the knowledge element.  For example, she

notes that Murrietta had a close relationship with her and lived with her an

extended period of time, and she argues that he knew of (and even suggested or

"devised") her transfer of the Terrill Loop Property to her son.  *See*, *e.g.*, Adv. No.

06-07020-TLM, Doc. No. 43 (Debtor's brief on summary judgment) at 5-6; *Id.*,

Doc. No. 58 (Debtor's trial brief) at 4-5.

The evidence does in fact establish that Murrietta lived with Debtor for

about three years.  However, because Murrietta no longer lived with Debtor after

*March*, 2005 (at the latest, and perhaps not after December, 2004), there is no

inference properly drawn that he knew of the *April*, 2005, transfer solely because

of his close living relationship.

Moreover, Debtor's arguments that Murrietta "devised" or suggested the

transfer of the property to Jae were not proven.  They were flatly contradicted by

Murrietta.  And, when Debtor was cross-examined, her initial claims regarding

Murrietta's involvement in that process (*i.e.*, that he not only suggested it, but that

he "told her to do it") were impeached.  She admitted under questioning from

Murrietta's counsel that Murrietta did not tell her to give the property to Jae but,

rather, she came up with the idea.  Though the idea apparently was at least in part

MEMORANDUM OF DECISION - 48

based on some property transfer that Murrietta had done at some time in the past and described to her, the contentions advanced by Debtor as to Murrietta's involvement in the Terrill Loop Property transfer were not proven to be true.

But even though these contentions of Debtor were not established, the question remains whether Murrietta has carried his burden of presenting preponderating evidence of the "lack of knowledge" required under § 727(d)(1).

Murrietta alleges that he had no knowledge of the transfer until "after March 2006," a date well after the November, 2005, discharge. *See* Adv. No. 06-07020-TLM, Doc. No. 28 (amended complaint) at 2, ¶ 8. Debtor's specific denial of this allegation, *see id.*, Doc. No. 50 at 2, ¶ 4 (amended answer), placed it at issue, and put Murrietta to his burden of proof. *See* 5 C. Wright & A. Miller, Federal Practice and Procedure §1261, §1266 (3d ed. 2008).

Murrietta, however, provided no explanation by testimony as to this assertion, or regarding the manner or nature of his indicated March, 2006, discovery of the transfer. This specific allegation remained merely a bare assertion.[54]

However, when Murrietta knew "of the transfer" is not the focus called for

---

[54]   Murrietta's only direct testimony related to the "transfer" (*i.e.*, the Quitclaim Deed) was to the effect that Debtor never referred to Bart (or Jae) "Van Skiver" as Jae "Avery" (the name shown on that Deed), and that he did not know they were two names for the same person, Debtor's son. *See also* Adv. No. 06-07020-TLM, Doc. No. 28 (amended complaint) at 2, ¶7. The Court did not find this testimony particularly credible given the several years Murrietta, Debtor and Jae lived under the same roof, and the interchangeable way the names Jae and Bart were used, especially by Debtor.

MEMORANDUM OF DECISION - 49

by the statute.  The question under § 727(d)(1) is when the plaintiff had knowledge "of such fraud" – the fraudulent conduct that would have presented a basis to oppose entry of the debtor's discharge.[55]  In this case, the facts that indicated a potential fraud included Debtor's claiming in her petition and schedules to reside at the Pine Street Property and her assertion of a homestead exemption therein, and her failure to disclose the Terrill Loop Property that Murrietta financed and knew Debtor put in her own name, either as an asset she owned or at least through a disclosure of some prebankruptcy transfer.  Those facts would put Murrietta, given his knowledge of Debtor and her affairs, on notice and require his diligence in investigating possible fraud.  Obtaining those facts would require only a review of the schedules and statements filed by Debtor, not knowledge of the specifics of the April, 2005 transfer or whether Jae Avery, as shown on the Quitclaim Deed, was the same individual as Debtor's son who Murrietta knew as "Bart Van Skiver."[56]

The key difficulty presented is that Murrietta never established when he

---

[55]  The Panel in *Bowman* cited the Eighth Circuit's decision in *Swendra*.  *See* 173 B.R. at 925.  *Swendra* rejected the argument that a plaintiff creditor needed to know *all of the facts* that constituted the alleged fraud before being subject to a dismissal under the knowledge requirement of § 727(d)(1), instead holding that such a dismissal is proper where the creditor "knows of facts that indicate a possible fraud . . . such that he or she is put on notice."  938 F.2d at 887-88.  With knowledge of such facts, the creditor has the "burden to investigate diligently any possible fraudulent conduct[.]"  *Id.*

[56]  Indeed, even if Jae Avery were a total stranger, Murrietta's learning that Debtor transferred the Terrill Loop Property, the initial acquisition of which he had financed, for $1.00 would be sufficient to trigger further investigation.

MEMORANDUM OF DECISION - 50

had reviewed the bankruptcy petition, schedules and statements.[57]  If he had

reviewed them prior to the November 22, 2005, bar date for objecting to discharge

(or for requesting, under Fed. R. Bank. P. 4004(b), an extension of the time to so

object), he would have sufficient facts to require investigation and to file either a

§ 727(a) complaint or a Rule 4004(b) extension request for further investigation.[58]

It was Murrietta's burden, as the party requesting revocation of discharge,

to prove his lack of knowledge of the fraud, as this was a positive element of his

cause of action.  None of his direct testimony went to this point.

The Court notes, however, that one aspect of the record appears to relate to

this issue.  In Murrietta's amended complaint – which he verified as "true and

correct to the best of his information, knowledge and belief"[59] – he alleges the

following in regard to Debtor's failure to disclose the transfer to her son, Jae:

---

[57]  He clearly reviewed them at some point in time.  His allegations in the amended
complaint, discussed *infra*, make that clear.  When he reviewed them is critical.  Murrietta never
established this date.  And, while Debtor's counter-arguments on Murrietta's knowledge of Jae's
true name, and the like, missed the mark, there is an underlying concern.  How plausible is it to
assume that Murrietta, having advanced Debtor (by his assertions at trial) over $70,000.00, would
not review the bankruptcy filing by Debtor in which he was named as a creditor.  He was not only
owed this money, but had asserted a cross-claim against Debtor in the Axtman litigation.  He had
lived with Debtor sufficiently long to know that she had real property interests in the Terrill Loop
Property, that he had financed and she had taken title to in her sole name, and in other properties.

[58]  Debtor's § 343 examination testimony at the September 23, 2005, § 341(a) meeting
also would have been probative on the issue of Murrietta's knowledge and diligence, but only if it
was shown that Murrietta was aware of that testimony prior to November, 2005.  He was not at
the § 341(a) meeting.  *See* Ex. 200; *see also* Doc. No. 8 (Trustee's § 341(a) minutes).  Just as the
evidence failed to establish when Murrietta first became aware of the petition, schedule and
SOFA defects, there was no affirmative evidence about when he became aware of Debtor's
statements at the § 343 examination.

[59]  Adv. No. 06-07020-TLM, Doc. No. 28 at 3.

MEMORANDUM OF DECISION - 51

14. The defendant [Debtor] had knowledge that creditors' rights would be affected because she failed to properly answer questions on her Statement of Affairs pertaining to gifts or transfers of property. Plaintiff [Murrietta], as a creditor, had a right to rely on the statements made, under oath, by defendant, *and did rely on such representations while the bankruptcy was proceeding.*

15. *As a direct and proximate result creditors have been damaged as a discharge has been granted* and they are unable to pursue their rights, and have been unable to obtain judgments against defendant for sums loaned to her.

Adv. No. 06-07020-TLM, Doc. No. 28 at 3, ¶¶14-15 (emphasis added).

Given that § 727(d)(1) requires that the plaintiff not have known of the fraud until after the granting of the discharge, the complaint fairly indicates that Murrietta "did rely" on the schedules and statements at a time when such "reliance" was possible, *i.e.*, at a time before November 22, 2005, when he could have taken action to oppose Debtor's discharge. If his review of the "representations" (the "statements made, under oath, by defendant") was only *after* discharge was entered, there could have been no "reliance" because the opportunity to object or to request an extension of time to object was already gone. The allegation as to "reliance" therefore indicates not only review, but review prior to the November, 2005, bar date. This conclusion is buttressed by the subsequent allegation in the complaint that "as a direct and proximate result" of the reliance on Debtor's SOFA representations, he and other creditors were "damaged as a discharge has been granted."

The Court concludes that the record does not contain preponderating

MEMORANDUM OF DECISION - 52

evidence that Murrietta did not know of Debtor's fraud until after the granting of

the discharge. The complaining plaintiff in a § 727(d) action has the burden of

proving all requisite elements by a preponderance of the evidence. Thus,

notwithstanding the Court's conclusion that the evidences establishes Debtor's

discharge was fraudulently obtained, Murrietta's failure to prove lack of

knowledge of such fraud before the discharge was granted is "fatal" to his

§ 727(d)(1) action. *See* 6 Collier on Bankruptcy ¶727.15[3] at 727-76.

Murrietta's complaint for discharge revocation will therefore be dismissed.

## CONCLUSION

Based on the foregoing, the Court finds, concludes and holds:

A.    Regarding discharge revocation under Adv. No. 06-07020-TLM and

Adv. No. 07-07033-TLM:

1.    Trustee's complaint to revoke Debtor's discharge pursuant to

§ 727(d)(1) will be dismissed as the same was not timely filed

under § 727(e)(1).

2.    Murrietta's complaint to revoke Debtor's discharge pursuant

to § 727(d)(1) will be dismissed on a failure of proof on the

statutory element that the plaintiff not know of the alleged

fraud until after discharge was granted.

3.    Trustee's and Murrietta's complaints to revoke Debtor's

discharge pursuant to § 727(d)(2) will be dismissed upon

MEMORANDUM OF DECISION - 53

failure of proof that there was a post-petition acquisition of

"property of the estate" not reported or surrendered.

The Court will enter judgments accordingly.

    B.     Regarding transfer avoidance under Adv. No. 07-07032-TLM:

        1.     Trustee's complaint to avoid the transfer of the Terrill Loop

Property as a fraudulent transfer under § 548(a)(1)(B) will be

granted. Judgment will be entered under § 550(a)(2) against

Debtor in the amount of $44,997.43 plus interest at the rate of

12% per annum, Idaho Code §28-22-104(1), from and after

March 10, 2006, to the date of entry of judgment. Post-

judgment interest will accrue pursuant to 28 U.S.C. § 1961.

Trustee shall prepare and submit a proposed form of judgment on this cause

consistent herewith.

DATED: July 18, 2008

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 54